J-S38002-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: G.L.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.R.C., MOTHER | : | No. 333 EDA 2019 |

Appeal from the Decree January 3, 2019
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-AP-0000840-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: G.L.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.R.C., MOTHER | : | No. 334 EDA 2019 |

Appeal from the Order Entered January 3, 2019
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0002707-2017

BEFORE:   OTT, J., DUBOW, J., and COLINS*, J.

MEMORANDUM BY OTT, J.:                    **FILED DECEMBER 17, 2019**

M.R.C. ("Mother") appeals from the order entered on January 3, 2019,

changing the permanent placement goal of her daughter, G.L.C. ("Child"),

born in September 2017, from reunification to adoption.  Mother also appeals

_____
* Retired Senior Judge assigned to the Superior Court.

from the decree entered the same day, terminating her parental rights to Child involuntarily.[1]  After careful review, we affirm.

The record reveals that the Philadelphia Department of Human Services ("DHS") has a lengthy history of involvement with Mother regarding her two older children, J. and A., who are not the subjects of this appeal.  Mother is an indicated perpetrator of abuse with respect to J. due to an incident that took place in 2000.  N.T., 1/3/19, at 12.  Reportedly, Mother "was at a party . . . people at the party were doing drugs, and . . . [J.], who was a baby at the time, was left on the floor, and . . . people fell and tripped on the baby, which led to [a] skull fracture."  *Id.* at 13.  DHS also received a validated general protective services ("GPS") report in 2014, indicating that Mother provided inadequate supervision for J. and that J. was suffering sexual abuse at the hands of a family member.  *Id.*  DHS received an additional validated GPS report in 2015, describing an incident during which Mother made J. "sleep in the same bed as her [and] her boyfriend.  And that when the child woke up, [M]other and her boyfriend were having sex.  [J.] went to get out of the bed, [and] [M]other told the child to lay back down."  *Id.* at 14.  Finally, DHS received a validated GPS report in 2016, indicating that Mother "and the grandmother had been coming to the home high, and that [J.] was smoking

_____

[1] In addition, the trial court entered separate decrees terminating involuntarily the parental rights of Child's putative father, R.C., and the parental rights of any unknown father that Child may have.  R.C. did not attend the termination and goal change hearing, nor did he participate in Child's dependency proceedings in any way.  Neither R.C., nor any unknown father, appealed the termination of his parental rights.

K2 and cannabis, and that there was a lack of supervision and concerns that her parents were also engaging in drug use with her." *Id.* Ultimately, J. turned eighteen and aged out of the system. *Id.* at 10-11. Mother terminated her parental rights to A. voluntarily. *Id.*

DHS first became involved with Child when it received a validated GPS report at the time of her birth in September 2017. *Id.* at 8-9. The report alleged that Child tested positive for THC and exhibited withdrawal symptoms. *Id.* at 9-10. In addition, Mother was homeless and had no place to live with Child. *Id.* at 9. DHS obtained emergency protective custody on October 11, 2017, and the trial court entered a shelter care order on October 13, 2017. The court adjudicated Child dependent on October 20, 2017, and set Child's permanent placement goal as reunification.

On October 17, 2018, DHS filed petitions to change Child's permanent placement goal to adoption and to terminate Mother's parental rights to Child involuntarily. The trial court conducted a hearing on January 3, 2019, at the conclusion of which it announced that it would change Child's goal to adoption and terminate Mother's parental rights. The court entered a goal change order and a termination decree that same day. Mother timely filed notices of appeal on January 24, 2019, along with concise statements of errors complained of on appeal.

On September 16, 2019, this Court remanded the matter and retained jurisdiction. *See In the Interest of G.L.C.*, 2019 WL 4415749 (Pa. Super. 2019) (unpublished memorandum). We stated that the trial court failed to

adequately address all of Mother's claims on appeal in its Pa.R.A.P. 1925(a) opinion and directed that the court provide us with a supplemental opinion specifically addressing claims two and three, and change of goal. The court filed its supplemental opinion on November 27, 2019, which was received by this Court on December 4, 2019, and we now address the merits of Mother's appeal.

Mother presents her claims on appeal as follows:

1. Whether the Trial Court erred in determining that the parental rights of Appellant/Mother are forever terminated, and the child's goal would be changed to adoption insofar as said findings failed to take into account and recognize the extensive efforts the Appellant/Mother had made to comply with the objectives of her Single Case Plan [("SCP")], and the Juvenile Act's mandate to preserve the family whenever possible[?]

2. Whether the Trial Court erroneously determined that the [Community Umbrella Agency ("CUA")] no longer needed to explore family members for placement for the child, insofar as the Appellant/Mother had from the outset of this case provided the CUA agency with the name and contact information of a Maternal Aunt of the child, residing in the State of Delaware, and the CUA agency allegedly had initiated procedures under the Interstate Compact on the Placement of Children (["]ICPC["]), that were still pending at the time of this Court's Order of January 3, 2019[?]

3. Whether the Trial Court failed to explore all potential relatives of the child as potential resources for the adoption and/or permanent placement of the child as outlined in Paragraph #2 stated above[?]

4. Whether the Trial Court erred in determining that the parental rights of Appellant/Mother are forever terminated insofar as:

a. Under 23 Pa. C.S.A. Section 2511 (a) (1) the Mother's consistent compliance with her visitation schedule with the child evidenced to the Court a

settled purpose of maintaining an ongoing relationship with the child[?]

b. Under 23 Pa. C.S.A. Section 2511 (a) (2) the conditions which led to the placement of the child were in fact being addressed by the Mother through her successful and ongoing Drug and Alcohol Treatment Therapy, and as such, no evidence existed that the Mother could not, or would not, remedy these conditions[?]

c. Under 23 Pa. C.S.A. Section 2511 (a) (5) there was no evidence submitted that the conditions which led to the removal of the child could not, or would not, be remedied within a reasonable amount of time, insofar as Mother submitted documentation that clearly illustrated her consistent compliance and dedication to Drug and Alcohol Treatment Therapy, further evidencing a commitment to recovery[?]

d. Whether the Trial Court erred in finding that under 23 Pa. C.S.A. Section 2511 (a) (8), termination of parental rights would best serve the needs of the child, insofar as Mother had voluntarily enrolled in, and actively participated in, a Drug and Alcohol Treatment Therapy Program, consistently visited with the child, and evidenced a commitment to recovery, all of which were objectives of her Single Case Plan, in the hope of being reunified with her child[?]

The following structural questions are raised for the first time in Appellant's Brief:

5. Whether the Trial [C]ourt erred in vacating the appointment of the child's attorney at the start of the termination hearing on the basis of her being too young to verbalize her preferred outcome, when there was no record of the child's attorney having attempted to ascertain her preference in any other way[?]

6. Whether the Trial [C]ourt erred in vacating the appointment of the child's attorney at the start of the termination hearing where 23 Pa.C.S.A. 2313(a) requires that the child's legal interests must be represented, and where there is no record of the Trial Court having ascertained whether the child had other legal interests at

stake such as her rights to connection to her biological relatives, the possibility of inheritance through her parents and their lineage, etc.[?]

7. Whether the Trial Court erred in failing to appoint counsel for [R.C.] throughout the life of the dependency and adoption matters where [R.C.'s] identity was known, and where the Court relied on allegations concerning [R.C.] in terminating Mother's rights as well as his own.

Mother's Brief at 4-6 (trial court answers omitted).

Our Courts review orders in goal change matters pursuant to an abuse of discretion standard of review. *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). Therefore, we must accept the trial court's findings of fact and credibility determinations if the record supports them, but we need not accept the court's inferences or conclusions of law. *Id.* We also adhere to an abuse of discretion standard of review in involuntary termination matters. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). As our Supreme Court has explained, "[t]he trial court's decision . . . should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings." *Id.* (citations omitted). To the extent Mother's claims require us to interpret relevant statutory authority and rules of court, our standard of review when doing so is *de novo* and our scope of review is plenary. *In the Interest of J.M.*, 166 A.3d 408, 416 (Pa. Super. 2017).

We begin by addressing Mother's fifth and sixth claims, in which she argues that the trial court erred by vacating the appointment of Child's legal

counsel at the start of the hearing. Although Mother failed to preserve these claims for our review in her concise statements, they are not subject to waiver. *See In re T.S.*, 192 A.3d 1080, 1092 (Pa. 2018) ("[W]e hold that a child's statutory right to appointed counsel under Section 2313(a) of the Adoption Act is not subject to waiver.").

The record reveals that the trial court appointed two attorneys for Child prior to the hearing, including legal counsel and a GAL. At the commencement of the hearing, legal counsel and the GAL agreed that Child needed only one attorney, since she was just over a year old and pre-verbal. N.T., 1/3/19, at 3-5. Accordingly, the court vacated the appointment of Child's legal counsel, and proceeded with only the GAL representing Child's interest. *Id.* at 6. The court's actions were in accordance with our Supreme Court's decision in *T.S.*, wherein the Court held as follows:

> In sum, we hold that . . . . during contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-[GAL] representing the child's best interests can also represent the child's legal interests. . . . [M]oreover, if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act that counsel be appointed "to represent the child," 23 Pa.C.S. § 2313(a), is satisfied where the court has appointed an attorney-[GAL] who represents the child's best interests during such proceedings.

*Id.* at 1092-93. Therefore, Mother is not entitled to relief on either of her claims.

Next, in her seventh claim on appeal, Mother asserts that the trial court erred by failing to appoint counsel for Child's putative father, R.C. Mother failed to preserve this claim for our review in her concise statements. Moreover, Mother could not have appealed the decree on behalf of R.C. because she lacked standing to assert putative father's right to counsel. **See In the Interest of H.K.**, 161 A.3d 331, 336 (Pa. Super. 2017) (holding that the father lacked standing to appeal a dependency order where, among other things, his arguments focused on the rights of the child's paternal grandparents). As a result, this Court lacks jurisdiction to address R.C.'s right to counsel in the termination proceeding.[2]

In her second and third claims, Mother argues that the trial court erred by failing to require that DHS and/or CUA conduct further family findings.[3]

---

[2] To the extent Mother seeks to challenge the trial court's failure to appoint counsel for R.C. in the dependency proceeding, and to the extent she may raise that challenge because she is an aggrieved party under the goal change order, we note that any such claim is moot in light of the decree terminating R.C.'s parental rights. **See In re D.A.**, 801 A.2d 614, 616 (Pa. Super. 2002) ("An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect.").

[3] Our statutory law and Rules of Juvenile Court Procedure require that a county child protective services agency engage in family finding. 62 P.S. §§ 1302.1, 1303; Pa.R.J.C.P. 1149, 1609. The Rules defines family finding as follows:

> The ongoing diligent efforts of the county agency, or its contracted providers, to search for and identify adult relatives and kin, and engage them in the county agency's social service planning and delivery of services, including gaining commitment from relatives

Mother's claims relate to her insistence that the court should place Child with a maternal cousin in Delaware rather than allow Child to remain with foster parent, an adoptive resource. Mother supports these claims with a single citation to legal authority. Specifically, she cites to Section 6351(f.1)(1) of the Juvenile Act, 42 Pa.C.S. § 6451(f.1)(1), for the proposition that "placement with a fit and willing relative of the child . . . is preferable in this case to the probable permanent loss of family connection when an infant is adopted by a non-family member." Mother's Brief at 27.

Mother's legal argument is misplaced. Section 6351(f) sets forth factors that a trial court must consider during each permanency hearing, discussed *infra*. Thereafter, Section 6351(f.1) provides, in relevant part:

> **§ 6351. Disposition of a dependent child.**
>
> . . .
>
> ***(f.1) Additional determination.*** **--** Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:
>
> > **(1)** If and when the child will be returned to the child's parent . . . in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.
> >
> > **(2)** If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in

and kin to support a child or guardian receiving county agency services.

Pa.R.J.C.P. 1120.

cases where return to the child's parent . . . is not best suited to the safety, protection and physical, mental and moral welfare of the child.

**(3)** If and when the child will be placed with a legal custodian in cases where the return to the child's parent . . . or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.

**(4)** If and when the child will be placed with a fit and willing relative in cases where return to the child's parent . . ., being placed for adoption . . . is not best suited to the safety, protection and physical, mental and moral welfare of the child.

. . .

42 Pa.C.S. § 6451(f.1)(1)-(4).

As such, assuming that reunification with a parent is no longer possible, Section 6351(f.1) requires that a trial court first consider achieving permanency for a dependent child through adoption, followed by placement with a legal custodian. 42 Pa.C.S. § 6351(f.1)(1)-(3). Only if both of those options would be contrary to the child's welfare does Section 6351(f.1) require a court to consider placement with a fit and willing relative. *See* 42 Pa.C.S. § 6351(f.1)(4).[4] In this case, as discussed *infra*, the trial court determined that Child's reunification with Mother is no longer possible, and that adoption

---

[4] The reason for this hierarchy is that placement with a fit and willing relative implies that the dependency case will continue indefinitely, including periodic review hearings. *See* Pennsylvania Dependency Benchbook (2019) at 12-9 ("Following placement with a relative, the agency continues to be involved in the case and provide supervision. . . . The dependency case remains open and the court continues to conduct permanency hearings until court supervision is terminated."). This is, understandably, less than ideal when the primary goal in a dependency proceeding is to provide permanency for the child.

is best suited to Child's welfare. Therefore, it was not necessary for the court to consider placing Child with a fit and willing relative pursuant to Section 6351(f.1).

Further, in its supplemental opinion, the court explained its determination that Child's foster placement continued to be appropriate, as follows.

> . . . . [T]he trial court found that the appropriate placement for the Child was for her to remain with the foster parent she had been living with since birth. At the termination hearing, Ms. Randall, the [CUA] Representative, testified that she saw the Child in the foster home and observed interaction with her foster parent in the home. Ms. Randall described how the Child bonded with her foster parent. . . .

> The trial court at the Termination Hearing evaluated the Mother's assertion that reasonable efforts had not been made to place the Child with a relative in the State of Delaware (["]Maternal Cousin"). The record reflected that CUA had been in contact with Mother's Maternal Cousin since February 2018. Moreover, the [M]aternal [C]ousin had filed a Motion to Intervene, which had been denied. Moreover, the record indicated that Maternal Cousin had visited the Child only once. Although the record indicated that the Maternal Cousin had received clearances as far back as February 2018 the record also indicated that CUA needed more information from the Maternal Cousin in September 2018. The record demonstrated, for example, that CUA even visited the Maternal Cousin's home. Consequently, the trial court determined that CUA had made reasonable efforts to explore the option of sending the Child to live with the Maternal Cousin. Moreover, the trial court also determined that it would cause greater harm to remove the Child from her Foster Parent and her foster siblings [with whom] Child had spent her entire life and had come to develop a loving bond. . . . It is in the best interest of the Child that . . . she remain with her Foster Parent.

Trial Court Opinion, 11/27/19, at 3-5 (citations to the record omitted).

The record supports the trial court's findings. During the hearing, DHS presented the testimony of CUA case manager Precious Randall. Ms. Randall testified that Child has lived in the same pre-adoptive foster home since shortly after her birth and displays "a bonding relationship" with her foster parent. N.T., 1/3/19, at 38. Child becomes upset when she separates from her foster parent to visit with Mother. *Id.* Child "screams and yell[s] to -- and stretches out to the foster parent." *Id.* In addition, Ms. Randall testified that Child shares a bond with the other children residing in the home. *Id.* at 44. "She -- when the other children come[] from school, she kind of, like, wants to jump out of her chair." *Id.* Ultimately, Ms. Randall opined that adoption by the foster parent would be in Child's best interest because the foster home is the only home that Child has ever known. *Id.* at 39.

Regarding Mother's request that Child reside with the maternal cousin, the record indicates that CUA investigated the possible placement of Child with the maternal cousin through the ICPC. *See* N.T., 1/3/19, at 56. CUA failed to make progress, apparently because "Delaware is one of the most difficult states to deal with." *Id.* Nonetheless, at a previous court date, the court ordered CUA to follow up and determine whether the maternal cousin was a potential resource. *Id.* The record also reveals that the maternal cousin filed a petition to intervene in Child's dependency, which the court denied. *Id.* at 55-56. When Mother's counsel attempted to argue at the conclusion of the

goal change and termination hearing that the maternal cousin was a potential resource for Child, the following exchange took place:

> [Counsel for Mother]: . . . . I would, again, fall back on our last appearance before Your Honor, when Your Honor indicated that that was a possible good potential resource for this child, and that --
>
> THE COURT: -- I didn't -- I didn't indicate it was a good potential resource.
>
> [Child's guardian *ad litem* ("GAL")]: No, you did not, Your Honor.
>
> THE COURT: I asked the worker to explore it.
>
> [Counsel for Mother]: And, Your Honor, and we are respectfully requesting that we continue to explore that, that if in fact the ICPC --
>
> THE COURT: -- [Counsel for Mother], this isn't a child that's been taken from placement to placement to placement. This child's in a stable home, and there's no way, in good conscience, that I would ever move that child, short of some problem in the foster home, or a family member being explored and appropriate placement with a family member. That's not the case here, other than she puts out that she's got this cousin that wants the child in Delaware.

*Id.* at 88.

We discern no abuse of discretion or error of law by the trial court, either in its supplemental opinion, or in its statements during the hearing. By the time of these proceedings, Child had spent nearly her entire life residing with her pre-adoptive foster parent. Child was bonded with the foster parent and with the other children in the home, and it was well within the court's purview

- 13 -

to conclude that removing Child from the only home she has ever known and placing her with a virtual stranger[5] would be contrary to her best interests.

We may now turn our attention to Mother's first and fourth claims, in which she contends that the trial court erred by changing Child's permanent placement goal to adoption and by terminating her parental rights to Child involuntarily. We begin by considering Mother's goal change claim.

With respect to determining whether to change the goal during a permanency hearing, trial courts must apply the following analysis:

> Pursuant to [42 Pa.C.S.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the [trial] court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

***In re A.B.***, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted).

---

[5] Mother testified that the maternal cousin and her husband visited with Child once. N.T., 1/3/19, at 69 ("When my cousin had a visit with her, she, like, she had a connection with my cousin and her husband.").

- 14 -

Here, the trial court addressed its decision to change Child's permanent placement goal briefly in its supplemental opinion, but the court explained that it changed Child's goal due to Mother's "ongoing inability to provide care for or control of Child due to her failure to remedy the conditions that brought the Child into care."  Trial Court Opinion, 11/27/19, at 3.  In addition, the court emphasized Child's bond with her foster parent, concluding that a goal change would be in Child's best interest because it would permit Child to remain in her foster home.  ***Id.*** at 3-5.

Mother endeavors to challenge the trial court's goal change decision by directing our attention to Section 6301(b)(1) of the Juvenile Act, which states that one of the goals of the Act is to maintain family relationships.  Mother's Brief at 15, 26; ***see*** 42 Pa.C.S. § 6301(b)(1) (stating the Juvenile Act's goal of preserving "the unity of the family whenever possible or to provide another alternative permanent family when the unity of the family cannot be maintained.").  She further contends that she made extensive efforts toward completing her SCP objectives.  Mother's Brief at 15, 27.

Our review of the record supports the trial court's conclusions.  During the hearing, Ms. Randall testified that Mother's SCP objectives were to address her lack of housing, attend drug and alcohol treatment, attend mental health treatment, and attend visits with Child.  N.T., 1/3/19, at 15.

Concerning Mother's compliance with her SCP objectives, Ms. Randall testified that CUA made two referrals to the Achieving Reunification Center

- 15 -

("ARC") for housing in January and April 2018. *Id.* at 16. To Ms. Randall's knowledge, Mother never completed the ARC housing program. *Id.* at 17. Ms. Randall received documentation from ARC that Mother "was closed out for being inactive." *Id.*

Nonetheless, Mother claimed that she was living with Child's maternal grandmother. *Id.* at 19. Ms. Randall reported that the grandmother's home was appropriate but expressed concern that Mother did not actually seem to live there. *Id.* at 18-19. Instead, Ms. Randall proposed that Mother was living secretly with R.C., who is a registered sex offender.[6] *Id.* at 19, 35, 42, 50. Ms. Randall explained that she attempted surprise visits at the maternal grandmother's home, once at 8:00 a.m. and once at 7:00 p.m., and that Mother was not there on either occasion. *Id.* at 18. Conversely, Ms. Randall reported seeing Mother depart from R.C.'s home early in the morning on approximately three occasions. *Id.* at 20, 50. She added that she saw Mother at a coffee shop only "a stone's throw away" from R.C.'s home on "more than four or five occasions[.]"[7] *Id.* at 50-51. On yet another occasion during a

---

[6] R.C. has been convicted of indecent assault of a minor victim by forcible compulsion. *See* DHS Exhibit 9 (R.C.'s Megan's Law Public Report).

[7] Mother conceded that she has been to R.C.'s home, but claimed that he was not there at the time and/or that she did not interact with him, and that she was present only to speak to Child's paternal grandmother. N.T., 1/3/19, at 66-67. Mother also acknowledged that she spends time at the coffee shop near R.C.'s home "[e]veryday, all day." *Id.* at 76. However, she maintained that she goes there because of its proximity to her friend's home, rather than

visit, Mother informed Ms. Randall that she was calling Child's "uncle or cousin" to come pick up a stroller. *Id.* at 34. R.C. then arrived at the CUA office. *Id.* at 34-35.

Regarding the drug and alcohol SCP objective, Ms. Randall testified that Mother had been attending a treatment program for over a year. *Id.* at 23. Because the program only lasts a year, it was transferring Mother to a new provider.[8] *Id.* at 25. Ms. Randall explained that Mother attended treatment due to her history of opioid dependency.[9] *Id.* at 24.

In addition, Ms. Randall testified that the trial court ordered Mother to participate in drug screens. *Id.* at 21. However, Mother had not submitted a screen since November 2018. *Id.* at 58. Ms. Randall explained that Mother was not submitting screens because "the case was postponed on the last court hearing. So according to her, since the case was postponed . . . she would not be held responsible to take the screens." *Id.* at 22. Prior to November 2018, Mother produced a diluted drug screen on March 15, 2018, and tested positive for cannabis on March 5, 2018, May 4, 2018, July 9, 2018, and July

_____

R.C.'s home. *Id.* at 77. Notably, both of Mother's older daughters, J. and A., also report that Mother lives with R.C. *Id.* at 72.

[8] Mother presented the trial court with a letter from the treatment program, which stated that she had been doing very well there. *See* Mother's Exhibit 1.

[9] Mother explained that her history of drug abuse goes back to approximately 2000 and that her drug of choice is Percocet. N.T., 1/3/19, 73.

17, 2018. *Id.* at 22-23; DHS Exhibits 7 and 8. Ms. Randall also agreed that Mother had submitted three screens "since September," which she believed included two positive screens and one negative screen. *Id.* at 51-52.

Concerning Mother's compliance with her mental health SCP objective, Ms. Randall testified that CUA had no documentation indicating that Mother ever received mental health treatment. N.T., 1/3/19, at 25. Mother's drug and alcohol treatment did include a behavioral health component. *Id.* Ms. Randall explained that she had ongoing concerns regarding both Mother's drug addiction and her mental health status. *Id.* at 26. For example, she reported that Mother fell asleep during her most recent visit with Child and then later denied that she had been sleeping. *Id.* at 26-27. Mother has also exhibited slurred speech during visits to the point where she "could barely express herself." *Id.* at 30. Ms. Randall recalled that Mother is argumentative or confrontational at seemingly every visit she attends, in that she is resistant to redirection and suggestions. *Id.* at 27-28.

With respect to the visitation SCP objective, Ms. Randall testified that Mother fails to interact with Child during visits and "only takes picture[s.]" *Id.* at 28. She elaborated as follows:

> The visits with [Mother] and [Child], [Mother] sits in a chair and [Child] crawls around the room by herself. Every time she tries to go outside, she will go and bring the child back. And 90 percent of the time she's taking pictures or she's on the phone, texting. Sometimes she calls her mom to talk to [Child]. And that's every visit that I have covered.

- 18 -

*Id.* at 28-29. On five or six occasions, Mother brought her adult daughter J. with her to visits with Child, and J. interacted with Child more than Mother did. *Id.* at 36-37. Ms. Randall reported that Child does not become upset when she separates from Mother at the conclusion of visits and opined that severing Child's relationship with Mother would not cause Child to experience mental or emotional harm. *Id.* at 38, 45.

Ms. Randall further testified that Mother initially received four-hour visits with Child. *Id.* at 31. However, Mother never once attended a visit for the full four hours. *Id.* Mother would take cigarette breaks and ended the visits early without explanation. *Id.* at 31-32. Additionally, Mother was almost always unprepared for visits. *Id.* at 32. Ms. Randall explained that Mother's visits took place in the community and that CUA asked Mother to decide where she would like the visits to take place ahead of time. *Id.* "99 percent of the time" she did not do so. *Id.* Sometimes Mother's visits did not occur due to this lack of planning. *Id.* Although the record is somewhat unclear, it appears that the trial court suspended the visits "at some point in the late summer."[10] *Id.* at 31. The court then reinstated the visits at an unspecified time. *Id.* at

---

[10] In the goal change and involuntary termination petitions, DHS averred that the trial court suspended Mother's visits because she "was routinely coming to the visits under the influence and refused to cooperate when she arrived." Petition for Goal Change to Adoption, 10/17/18, Statement of Facts at ¶ cc; Petition for Involuntary Termination of Parental Rights, 10/17/18, Statement of Facts at ¶ cc.

30. At the time of the hearing, Mother's visits were only two hours in length.

*Id.*

Accordingly, based on testimony, which the trial court found credible, changing Child's permanent placement goal from reunification to adoption is in Child's best interest. Mother lacks appropriate housing, as she lives with R.C., who is a registered sex offender. Mother's drug abuse and mental health issues also remain ongoing concerns. Mother fails to interact with Child during visits and Child appears to have little if any bond with her. Conversely, as detailed above, Child appears to share a bond with her pre-adoptive foster parent, with whom she has lived throughout nearly her entire life. Mother is not entitled to relief.

We next consider Mother's challenge to the involuntary termination of her parental rights. Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S. § 2511. It requires a bifurcated analysis:

> . . . . Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In the instant matter, the trial court terminated Mother's parental rights to Child pursuant to Sections 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision pursuant to Sections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

\*\*\*

23 Pa.C.S. § 2511(a)(2), (b).

We begin by considering whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2):

> . . . . In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

In this case, the trial court concluded that clear and convincing evidence existed to terminate Mother's parental rights. The court found that Mother failed to comply with her SCP objectives. Trial Court Opinion, 3/11/19, at 3-6. Specifically, the court found that Mother failed to address her substance abuse and mental health needs, failed to remedy her housing concerns, and maintained a relationship with R.C., who is a sex offender. *Id.* The court explained that it found Ms. Randall's testimony credible and accorded it great weight. *Id.* at 6.

Mother responds by asserting that she was complying with her drug and alcohol treatment and visiting with Child. Mother's Brief at 16, 20-21. She further asserts that she had employment and appropriate housing with Child's maternal grandmother. *Id.* at 20

The record supports the trial court's findings and conclusions. Once again, it is clear that Mother failed to comply with her SCP objectives. Mother's drug abuse and mental health issues remained ongoing concerns. Mother also lacked appropriate housing, as she lived with R.C., who is a registered sex offender. Finally, Mother exhibited poor parenting skills during visits by failing to interact with Child. By the time of the hearing, Child was just over a year old and had spent nearly her entire life in foster care. Meanwhile, Mother had made little if any progress toward regaining custody. It is evident that Mother is incapable of parenting Child pursuant to Section 2511(a)(2), and that she cannot or will not remedy her parental capacity. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

We next address the involuntary termination of Mother's parental rights to Child pursuant to Section 2511(b). Mother failed to preserve any claim regarding Section 2511(b) in her statement of questions involved and concise statements. Moreover, Mother does not attempt to challenge the trial court's

findings in the argument section of her brief, other than by inserting a single sentence stating that she has "maintained her bond."  Mother's Brief at 20.  Thus, we conclude that she has waived this claim and we affirm the decree terminating her parental rights involuntarily as to both Sections 2511(a) and (b).  ***See In re M.Z.T.M.W.***, 163 A.3d 462, 465-66 (Pa. Super. 2017) ("[T]his Court will not review a claim unless it is developed in the argument section of an appellant's brief. . . . Further, it is well-settled that issues not included in an appellant's statement of questions involved and concise statement of errors complained of on appeal are waived.").

Based on the foregoing, we conclude that the trial court did not commit an abuse of its discretion or an error of law by changing Child's permanent placement goal to adoption and terminating Mother's parental rights to Child involuntarily.  Accordingly, we affirm the court's January 3, 2019 order and decree.

Order affirmed.  Decree affirmed.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/17/19